UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| vs. | CRIMINAL CASE NO. 3:09-CR-23 (JCH) : |
| | : October 17, 2019 |
| JOEL SOTO | |

## <u>MEMORANDUM IN AID OF RESENTENCING</u>

Joel Soto is scheduled to appear before this Court for resentencing on October 31, 2019. At that time, he will respectfully request that the Court resentence him to time served (approximately 150 months, with good time credit),[1] along with a period of supervised release that includes the implementation of the Comprehensive Reentry Plan attached at Exhibit A.

Mr. Soto respectfully submits that the factors in 18 U.S.C. § 3553(a) favor a sentence of time served. Mr. Soto was the only one of 29 co-defendants to receive a jury verdict. His decision to go to trial was not fully informed and resulted in him facing a significantly higher Guidelines range than he would have faced had he accepted the government's plea offer or received points for acceptance of responsibility. Other important factors for the Court to consider on resentencing are Mr. Soto's difficult childhood; his severe substance-abuse history starting at the very young age of 12; his relatively minimal criminal history; his youth at the time of the offense; his current age (37 years old); his impressive accomplishments in prison; his favorable prospects for employment after obtaining practical vocational training in the Bureau of Prisons; and the unlikelihood of recidivism in light of his current age, rehabilitation in prison, and relatively modest criminal history. Finally, the Court should

---

[1] Mr. Soto has been continuously incarcerated since February 4, 2009 for a total of 10 years, 8 months and 27 days (as of October 31, 2019). With good conduct time, and accounting for the loss of 41 days' good conduct time (for Mr. Soto's single disciplinary violation), that sentence is the equivalent of approximately 150 months.

consider that Mr. Soto's mother is currently being treated for Stage IV cancer and that if released, Mr. Soto plans to seek permission to visit and spend time with her in Puerto Rico. In his letter to the Court (ECF No. 1816-1), Mr. Soto notes that his mother's diagnosis "breaks my heart daily," that she "is aware of my situation and is excited that I may get relief," and that "I hope [to] spend some time with her because I know one of her biggest wishes is to see me out of these prison walls before she passes away."[2]

## HISTORY AND CHARACTERISTICS

Mr. Soto was born and raised in the West End (West Side) neighborhood of Bridgeport, Connecticut. PSR ¶ 39. From an early age, he was exposed to "rough" neighborhoods with "open drug activity and violence." *Id.* This noxious environment took its toll on Mr. Soto, who started abusing alcohol and marijuana at age 12, and started suffering anxiety attacks at age 14. *Id.* ¶¶ 39, 46. Chronic anxiety attacks interfered with Mr. Soto's ability to succeed at school, as he was "frequently sent home by the nurse" due to his anxiety. *Id.* ¶ 49.[3] Mr. Soto dropped out of high school in the 9th grade. *Id.* Efforts to treat his anxiety with prescribed medication were short-lived and unsuccessful, and Mr. Soto continued to self-medicate with alcohol and marijuana. *Id.* At the time of his arrest on his 27th birthday, Mr. Soto was drinking as much as a pint of cognac and a twelve-pack of beer every

---

[2] *See United States v. Jones*, No. 3:99-CR-264 (VAB), 2019 WL 4933578, *17 n.3 (D. Conn. Oct. 7, 2019) (Bolden, J.) (in resentencing defendant to time served under the First Step Act, noting that defendant's "desire to care for his ailing wife, who has Stage IV cancer, and family, is additional evidence of post-sentencing rehabilitation."

[3] Because trauma interferes with the brain's gate-keeping functions and ability to filter information, children who experience trauma may have impaired ability to pay attention and concentrate, which in turn has a detrimental effect on their school performance. *See* BESSEL VAN DER KOLK, THE BODY KEEPS SCORE: BRAIN, MIND, AND BODY IN THE HEALING OF TRAUMA 70 (2014).

day. *Id.* ¶ 45.[4] Mr. Soto's alcohol abuse contributed to the frequently co-occurring disorder of problem gambling. Prior to his arrest, Mr. Soto drove 90 minutes from Bridgeport to the MGM Grand at Foxwoods twice a week, where he gambled "any little money" he had to "try to make it grow." *Id.* ¶ 47.[5]

In spite of these challenges, Mr. Soto had a strong work ethic from a young age. At ages 16–17, he stocked shelves at OfficeMax in Fairfield. *Id.* ¶ 57. At ages 17–18, he worked as a cashier at Stop & Shop in Westport. *Id.* At age 19, he sorted and cleaned clothes at Fairfield Cleaners and worked in the kitchen as a prep cook at Brooklawn Country Club in Fairfield. *Id.* ¶ 56. In the years that followed, Mr. Soto worked a variety of jobs to support his girlfriend and their son, including stocking shelves at J.C. Penney in Trumbull, working in the kitchen at Sacred Heart University in Fairfield, and cleaning gutters for a company based in Newtown. *Id.* ¶¶ 52–53, 55. By all accounts, Mr. Soto was a caring and attentive father to his son, Joel Soto, Jr. *Id.* ¶ 42.

---

[4] Studies show that children who experience four or more traumatic events are four to twelve times more likely than the general population to suffer from alcoholism. *See* S. R. Dube *et al.*, *Adverse Childhood Experiences and Personal Alcohol Abuse as an Adult*, 27 ADDICTIVE BEHAVIORS 713 (Fall 2002).

[5] Scientists have also discovered a link between childhood trauma and gambling disorder. A recent twin cohort study found that witnessing another individual badly hurt or killed increased the risk of becoming a pathological gambler by 183 percent, and experiencing a physical attack increased the risk of becoming a pathological gambler by 239 percent. J.F. Scherrer, *et al.*, *Association Between Exposure to Childhood and Lifetime Traumatic Events and Lifetime Pathological Gambling in a Twin Cohort*, 195 J. NERVOUS & MENTAL DISEASE 72 (2008). Other research has revealed a dramatic link between alcoholism and gambling disorder, finding that people diagnosed with problem gambling were 23 times more likely to be diagnosed as alcohol dependent than those who were not problem gamblers. J. Welte, *et al.*, *Alcohol and Gambling Pathology Among U.S. Adults: Prevalence, Demographic Patterns and Comorbidity*, 62 J. STUDIES ON ALCOHOL 706–712 (2001).

At the young age of 23, Mr. Soto became involved in a crack-cocaine conspiracy in Bridgeport.[6] Mr. Soto joined in the waning days of the conspiracy.[7] He was arrested in this case on February 4, 2009 – his 27th birthday. In 2010, at age 28, Mr. Soto was sentenced to 19 years' imprisonment and 8 years' supervised release. ECF No. 1426.

In the more than nine years since his sentencing, Mr. Soto has worked to rehabilitate himself in the BOP. Mr. Soto completed BOP's 40-hour Non-Residential Drug Abuse Program (NRDAP). *See* ECF No. 1812-3 (Aug. 15, 2018 Bureau of Prisons Psychology Services Group Participation Report). He participated in GED preparation courses and earned his GED while confined. *See* ECF No. 1811-7. He completed certificate classes in HVAC Electrical and Gas Heating and participated in 138 hours of vocational training in Carpentry. *See id.* Furthermore, Mr. Soto also completed a variety of educational programs, including Young Men Incorporated, Ready to Work, Nutrition, Employment, Understanding Recidivism, Health, Weight Management, Men's Health Leisure Class, Mock Job Fair, Typing Efficiency, Class Film 1, How to Write a Book, How to Compose a Screen Play, Parenting, Calligraphy, Limited Liability Corporation, Real Estate 101, Math, First Aid/Safety, Principles Management, CBT – ACT I, Public Speaking, Advanced Spin Class, Business Law, Keyboarding, and Leather. *See id.*

Mr. Soto is now 37 years old and has served nearly 11 years in prison. The BOP estimates his release date to be September 29, 2025, at which time he will be 43 years old. Undersigned counsel

---

[6] Although the charged conspiracy was from January 2002 until February 2009, at Mr. Soto's sentencing, the Court held that the government had proven, by a preponderance of the evidence, that Mr. Soto participated in the conspiracy from January 2006 until December 2006 and from June 2007 until December 2008, a period of no more than 125 weeks.

[7] "The most prolific years of the Sanchez conspiracy were from 2003 to 2006, when Sanchez had access to a steady supply of cocaine in Puerto Rico." PSR ¶ 9.

respectfully submits that in light of the Section 3553(a) factors, there is no need to incarcerate Mr. Soto for an additional six years.

## PROCEDURAL HISTORY

On October 1, 2009, Mr. Soto was found guilty of one count of conspiracy to possess with intent to distribute and to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii) & 846, and one count of conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii) & 846. ECF No. 953.

Mr. Soto was one of 29 defendants charged in the conspiracy, and was the only one to receive a jury verdict following a completed trial. *See* ECF No. 1511 at 51.[8] In hindsight, Mr. Soto strongly regrets the decision to go to trial, a decision that he recognizes was ill-advised. He asserts that he believes he would have reached a different decision, *i.e.*, the decision to plead guilty, if he had the opportunity to review the discovery prior to going to trial. It is unclear how much, if any, discovery, Mr. Soto saw. While his case was pending, he was incarcerated at Wyatt. Wyatt records indicate that his first lawyer never visited him at Wyatt and his second lawyer (who took the case to trial and sentencing) visited him twice at Wyatt: once for one minute prior to trial to communicate the government's plea offer, which included a stipulated Guidelines range of 151–188 months, and once more after trial and prior to sentencing. *See* ECF Nos. 1812-1 & 1812-2 (Wyatt Visitation Records).

On June 23, 2010, this Court sentenced Mr. Soto to 19 years' imprisonment and 8 years' supervised release on each count, to run concurrently. ECF No. 1426. Mr. Soto's longest previous

---

[8] Co-defendant George Sanchez pleaded guilty after four days of trial. *See* ECF No. 949.

term of imprisonment had been 15 months, which he served in 2002–2003 for a probation violation. PSR ¶ 30.[9]

At sentencing, the Court found an attributable drug quantity of at least 50 kilograms of powder cocaine. ECF No. 1511 at 35–36. The quantity determination was based on the Court's finding that Mr. Soto participated in the 7-year conspiracy for no more than 125 weeks. *See id.* at 13–14, 34. Under the then-existing Drug Quantity Table, this attributable drug quantity produced a base offense level of 36. U.S.S.G. § 2D1.1(c) (2009). There were no adjustments to the base offense level. The Court also determined that Mr. Soto had 11 criminal history points and fell within Criminal History Category V, which resulted in a Guidelines range of 292–365 months' imprisonment. *See id.* at 39.[10]

Mr. Soto was at Criminal History Category V based on minor convictions including "Evading," "Operating Under Suspension," "Run From Police," "Breach of Peace" and "Failure To Appear." PSR ¶¶ 31–35. Counsel for Mr. Soto "argued that the CHC calculation, which incorporated two motor vehicle charges and two offenses with fines totaling $1,000, substantially over-represented the seriousness of Soto's criminal history in general." *Soto v. United States*, No. 3:13-CV-268 (JCH), 2014 WL 468204, *3 (D. Conn. Feb. 5, 2014). The government agreed that "there's some merit to the *Mishoe* departure" and stated that it "would take no position with that respect to the one-level departure." ECF No. 1511 at 58.

---

[9] Mr. Soto was 18 years old at the time of the underlying offense, a 2000 conviction for sale of narcotics, which the Court noted was Mr. Soto's "only drug conviction" prior to his federal arrest. ECF No. 1811-5 at 3.

[10] The Presentence Report had calculated 13 criminal history points and a Criminal History Category VI, but at sentencing, the Court found that Mr. Soto had 11 points, corresponding with Criminal History Category V, by finding that the offense in paragraph 36 of the Presentence Report should not receive points because it was relevant conduct to the instant offense. *See* ECF No. 1511 at 37.

In imposing sentence, the Court agreed that several of Mr. Soto's prior convictions were "minor offenses but they sort of rack up the points against him by the number of them . . . ." *Id.* at 65. The Court observed that "the sum total of time [that Mr. Soto has] been in jail is less than 30 months" and that his longest previous sentence was only 15 months. *Id.* at 57–58. The Court found that a sentence of 15 months would not adequately deter Mr. Soto from further engaging in criminal conduct, but "[t]he problem is that . . . the sentences that Congress thinks are appropriate are many, many multiples of that." *Id.* at 62. The Court opined that "[n]ormally somebody with a five level in this court's view would have had at least one lengthy criminal sentence that would demonstrate to the court that sentences don't deter. Fifteen months . . . is not as much as I would expect in a level 5." *Id.* at 65. The Court concluded that "[w]hile *it really seems like a waste to lock you up*, the fact of the matter is, it is not a waste in the sense that society avoids the risk of you selling illegal drugs by locking you up." *Id.* at 63 (emphasis added).

The Court recognized that there was no evidence that Mr. Soto was involved in any violence. *See id.* at 59 (noting that defense counsel "is right to emphasize the fact there's absolutely no evidence in this case record before me, I don't have any consideration of this when I think of you that you were involved in any violence and that's obviously a very positive thing for you"). The Court also acknowledged Mr. Soto's addiction issues, noting that Mr. Soto has had substance abuse issues since he was 12 years old and that the Court "understand[s] a person with addictive personality can't control themselves." *Id.* at 60. Finally, the Court told Mr. Soto that it "[s]ounds like you are a very good father" and "[o]bviously you love that child very much." *Id.*

The Court imposed a below-Guidelines sentence of 228 months on each of the two counts, to be served concurrently. In the Statement of Reasons, the Court indicated that it was persuaded by

defense counsel's criminal history argument, stating that it "imposed a sentence outside the guideline range based on the overstatement of the defendant's criminal history. The defendant's previous convictions resulted in short terms of imprisonment and his only drug conviction was at age 18." ECF No. 1811-5 at 3. *See also Soto*, 2014 WL 468204, at *7 ("[Defense counsel's] argument concerning criminal history was a key factor in the court's decision to impose a nonguideline sentence far below the bottom of Soto's guideline range.").

Although the Court did not explicitly grant a horizontal departure pursuant to *Mishoe*, the Court imposed a sentence (228 months) that was within the Guidelines imprisonment range for a defendant with a total offense level of 36 and a Criminal History Category of either I (188–235 months) or II (210–262). *See* Gov't Resp. to Mot. under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence, *Soto v. United States*, 3:13-cv-268 (JCH), ECF No. 14 (Sept. 19, 2013) ("Gov't's § 2255 Opp'n") at 18 ("In sum, Attorney Hillis achieved a major downward departure for Soto from CHC VI to CHC I."). From another perspective, the Court varied downward from the bottom of the applicable Guidelines range (292 months) by 64 months, or approximately 21.92%.

On January 6, 2012, the Second Circuit affirmed the judgment and sentence. *United States v. Sanchez*, 455 F. App'x 27, 31–32 (2d Cir. 2012).

On December 21, 2018, the president signed the First Step Act of 2018 ("First Step Act"), PL 115-391, 132 Stat. 5194 (2018). The First Step Act makes retroactive certain provisions of the Fair Sentencing Act of 2010 and empowers district courts to "impose a reduced sentence" as if the Fair Sentencing Act "had been in effect at the time of the covered offense." § 404, 132 Stat. at 5222. On April 16, 2019, Mr. Soto filed a motion for immediate release or resentencing pursuant to the First Step Act (ECF No. 1809). On October 9, 2019, the Court ruled that Mr. Soto is eligible for relief

under the First Step Act and scheduled a plenary resentencing hearing for October 31, 2019. ECF Nos. 1830, 1831.

## LEGAL ARGUMENT

In light of the § 3553(a) factors, the current Guidelines, the unique procedural history surrounding Mr. Soto's case (in particular, his ill-informed decision to reject the government's plea offer and proceed to trial), and the paradigm shift in drug sentencing over the last decade, Mr. Soto respectfully requests that the Court resentence him to time served, followed by a five-year period of supervised release.

**I.      The governing legal standard requires the Court to impose the sentence that is minimally sufficient to accomplish the goals of sentencing.**

A.      <u>The statutory factors and purpose of a criminal sentence</u>

Pursuant to 18 U.S.C. § 3553, the Court is required to impose in each case a sentence that is "sufficient but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2). Those purposes reflect the need for the sentence that is imposed:

(A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)      to afford adequate deterrence to criminal conduct;

(C)      to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In determining what sentence will best achieve these purposes in each case, the sentencing court must consider the following factors:

1.      The nature and circumstances of the offense and the history and characteristics of the defendant;

2.      The kinds of sentences available and the applicable sentence under the Sentencing Guidelines;

3.      Pertinent policy statements issued by the Sentencing Commission;
4.      The need to avoid unwarranted sentence disparities among similar defendants guilty of similar conduct; and
5.      The need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1), (a)(3) - (a)(7).

        B.      <u>The Guidelines are not to be presumed reasonable.</u>

While the Court is required to consider the range of penalties suggested by the Sentencing Guidelines in determining the appropriate sentence in a given case, it is not bound by that range. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, the Supreme Court has repeatedly reminded sentencing courts that: "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009); *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (emphasizing that the only "presumption of reasonableness" that applies to a Guidelines sentence is "an appellate court presumption," not applicable in the initial sentencing analysis conducted by the district court). Thus, while the Court must consider the recommendations of the advisory Guidelines, the Court *may not* presume that those recommendations are reasonable. Instead, the Court must treat the recommended Guidelines sentence as only one among numerous factors.

Indeed, sentencing courts are free to disagree with the Guidelines-recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a). This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the Guidelines. *See Pepper v. United States*, 562 U.S. 476, 501 (2011) ("[O]ur post-*Booker* decisions make clear that a district court may, in appropriate cases, impose a non-Guidelines sentence based on a disagreement with the Commission's views . . . . That is particularly true where, as here, the Commission's views rest on

10

wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted.");
*Spears v. United States*, 555 U.S. 261, 265–66 (2009) (*per curiam*) (confirming *Kimbrough*'s holding
that courts may vary from a particular guideline because of a policy disagreement with that guideline).

The Court should be particularly careful not to presume that the drug-trafficking guidelines
are reasonable. In *United States v. Diaz*, No. 11-CR-00821 (JG), 2013 WL 322243 (E.D.N.Y. Jan. 28,
2013), Judge Gleeson assailed the drug-trafficking guidelines for being "deeply and structurally
flawed." He acknowledged that as a result, the Guidelines produce "ranges that are excessively severe
across a broad range of cases. . . ." *Id.* at *1. Accordingly, although Judge Gleeson considered the
Guidelines range in the *Diaz* case, he placed almost no weight on it. He reasoned as follows:

> If the Commission wants greater adherence to the Guidelines, as it should, it
> needs to get better at fixing broken offense guidelines. The drug trafficking
> offense guideline was born broken. Many judges will not respect it because as
> long as the sentences it produces are linked to the ADAA's mandatory
> minimums, they will be too severe. Indeed, as discussed further below, for almost
> two decades the nation's judges have been telling the Commission to de-link the
> drug trafficking offense guideline from those harsh mandatory minimums and to
> reduce the sentencing ranges. The Commission should listen and act. It should
> use its resources, knowledge, and expertise to fashion fair sentencing ranges for
> drug trafficking offenses. That process will take time. In the meantime, because
> real people, families, and communities are harmed by the current ranges, it should
> immediately lower them by a third . . . .

> Let those who advocate for longer prison terms, and even a return to the dark
> days of mandatory Guidelines, go ahead and make their case. The debate is good
> for the health of our federal criminal justice system. But the suggestion that
> federal sentences should become more severe in the name of racial equality is
> preposterous. That case has emphatically not been made, and the Commission's
> repeated suggestion that it has insults the entire judiciary and demeans the
> Commission itself. If it does nothing else, the Commission should take
> affirmative steps to remove the race issue, which it unwisely inserted into the
> discussion of federal sentencing policy, from the debate . . . .

> The Commission should use its resources, knowledge, and expertise to fashion
> fair sentencing ranges for drug trafficking offenses. If it does, those ranges will
> be substantially lower than the ranges produced by the current offense guideline.

11

> The deep, easily traceable structural flaw in the current drug trafficking offense guideline produces advisory ranges that are greater than necessary to comply with the purposes of sentencing. We must never lose sight of the fact that real people are at the receiving end of these sentences. Incarceration is often necessary, but the unnecessarily punitive extra months and years the drug trafficking offense guideline advises us to dish out matter: children grow up; loved ones drift away; employment opportunities fade; parents die.

*Id.* at *9, *18. Although the two-level amendment addressed some of Judge Gleeson's concerns, it did not go far enough. It amounted to only a 20% reduction in the range, as opposed to the necessary reduction. Moreover, there was no empirical data from which to conclude that the reduction was logical or sufficient. Judge Gleeson's opinion urged a more systematic and deeply considered analysis of the appropriateness of the drug trafficking guidelines.

      C.    The Parsimony Clause

In determining an appropriate sentence, the sentencing court must apply the "parsimony clause" set forth in 18 U.S.C. § 3553(a), which provides that the Court "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. The Second Circuit explained in *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *See id.* at 142 (stating that where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

## II.    The advisory Guidelines range.

In calculating the Guidelines range that applies to Mr. Soto for purposes of his resentencing, the Court should use the 2018 Guidelines Manual. *United States v. Benjamin*, No. 3:09-CR-265 (JBA), 2019 WL 5092246, *1 (D. Conn. Oct. 11, 2019). Under the current Guidelines, Mr. Soto's

total offense level is 34. His Criminal History Category is IV. His Criminal History Category was erroneously calculated as Category V at his original sentencing. He should not have been awarded any criminal history points for his February 2006 conviction for second-degree Failure to Appear, or his March 2006 conviction for second-degree Breach of Peace. *See* PSR ¶¶ 34–35. A breach of peace conviction for which one receives no probation and no jail time, as was the case here, does not receive any points pursuant to U.S.S.G. § 4A1.2(c)(1) (listing disturbing the peace). In addition, a failure to appear conviction for which one serves no time and receives no probation, as was the case here, has been held to constitute contempt of court, which also does not receive any points pursuant to § 4A1.2(c)(1). *See, e.g.*, *United States v. Tigney*, 367 F.3d 200 (4th Cir. 2004) (holding that the offense of failure to appear is "similar to" the offense of contempt of court, in that the essential elements of both are a willful violation of a lawful court order). *See also United States v. Garrett*, 528 F.3d 525, 528–29 (7th Cir. 2008) (citing cases). Mr. Soto received two criminal history points for these convictions, without which he would have had a total of 9 criminal history points (instead of 11), establishing a Criminal History Category of IV (instead of V).

An offense level of 34 and Criminal History Category of IV results in a Guidelines range of 210–262 months' imprisonment. Mr. Soto submits, however, that the Court should consider subtracting three levels for acceptance of responsibility, given the fact that Mr. Soto would have made the decision to plead guilty had he had an opportunity to view his discovery and consult with counsel. Subtracting three points for acceptance of responsibility, the offense level would be 31, which, when combined with a Criminal History Category of IV, results in a Guidelines range of 151–188 months. This is the same Guidelines range that the government offered as the stipulated Guidelines range in the original plea agreement.

In the alternative, if the Court decides not to subtract three levels for acceptance of responsibility in calculating the advisory Guidelines range, Mr. Soto submits that the Court should vary downward from the Guidelines range of 210–262 months to achieve the same effect.

**III.  A sentence of time served, followed by a five-year period of supervised release, is the appropriate sentence in this case.**

A sentence of time served (approximately 150 months) is appropriate in this case for at least nine reasons: (1) Mr. Soto's minimal criminal history; (2) Mr. Soto's acceptance of responsibility and the unique circumstances surrounding his decision to proceed to trial; (3) Mr. Soto's youth at the time of the offense; (4) Mr. Soto's rehabilitation; (5) the concept of incrementally proportionate punishment; (6) recidivism statistics relevant to deterrence; (7) the paradigm shift in federal sentencing over the last decade; (8) the availability of a reentry plan; and (9) the purposes of sentencing. Each of these reasons is discussed below.

A.  <u>The Court should vary downward based on Mr. Soto's minimal criminal history.</u>

In 2010, the Court "imposed a sentence outside the guideline range based on the overstatement of the defendant's criminal history" because "[t]he defendant's previous convictions resulted in short terms of imprisonment and his only drug conviction was at age 18." ECF No. 1811-5 at 3. Now, as then, Mr. Soto's Criminal History Category (even at IV) overstates the severity of his criminal history and warrants a significant downward variance.

At the original sentencing, the Court found that Mr. Soto's total offense level was 36 and Criminal History Category was V, resulting in a Guidelines range of 292–365 months' imprisonment. *See* ECF No. 1511 at 39. The Court imposed a sentence of 228 months' imprisonment, which was within the Guidelines imprisonment range for a defendant with a total offense level of 36 and a Criminal History Category of either I or II. *See* Gov't's § 2255 Opp'n at 18 ("In sum, Attorney Hillis

14

achieved a major downward departure for Soto from CHC VI to CHC I."). Under the current Guidelines, Mr. Soto's total offense level is 34, which with a Criminal History Category of IV, results in a Guidelines range of 210–262 months' imprisonment, unless the Court gives Mr. Soto the three-level reduction for acceptance of responsibility. Should the Court decide to impose a sentence within the Guidelines range for an offender with the same total offense level, but a Criminal History Category of I, as it did in 2010, the reference range would be 151–188 months' imprisonment – again, the same as the stipulated Guidelines range in the original plea offer.

      B.    <u>The Court should vary downward based upon Mr. Soto's acceptance of responsibility, even though he went to trial in 2009, or in recognition of the Guidelines range in the plea offer.</u>

Mr. Soto was the only one of 29 co-defendants to assert his right to trial by jury and to receive a jury verdict. The decision to go to trial was a decision that was not fully informed, that Mr. Soto deeply regrets, and that resulted in him not receiving a reduction for acceptance of responsibility that might have spared him years in prison.[11] A brief recitation of Mr. Soto's representation and plea negotiations explains why Mr. Soto went to trial and faced harsher sentencing guidelines as a result.

On February 4, 2009, the Court appointed Attorney Terri-Ann Knapsack to represent Mr. Soto. *See* ECF No. 250. On July 20, 2009, Attorney Michael Hillis entered an appearance (ECF No. 676) and apparently took over the representation, as Attorney Knapsack later informed the Court that she had "been on a leave of absence since July of 2009" (*see* ECF No. 915).

---

[11] Mr. Soto does not intend to relitigate the ineffective assistance of counsel claim that was the basis of his 2013 *pro se* habeas petition in *Soto v. United States*, 3:13-cv-268 (D. Conn.) (JCH), but only to explain and contextualize the circumstances that led Mr. Soto to proceed to trial at great cost to his liberty.

On August 5, 2009, the government provided Attorney Hillis with a written plea offer and cover letter for Mr. Soto. *See Soto*, 2014 WL 468204, at *1. The plea offer contained a stipulated Guidelines range of 151–188 months. *See id.* The cover letter stated that "[t]he terms offered in this plea agreement, particularly the absence of the filing of a second-offender information, shall expire on August 19, 2009." *See id.* On August 19, 2009, the day the plea agreement was due to expire, Attorney Hillis faxed the government to request an extension of the deadline until Monday, August 24, 2009, stating:

> There is a good chance that I can convince Mr. Soto that the plea agreement is in his best interest if you can extend the time to accept the offer from today until Monday at 12:00 pm. In Mr. Soto's defense, he has had to deal with a "changing of the guard" concerning attorneys. I will need the extra time to discuss the ratifications of his choices.

*See id.* at *2. The government agreed to the extension. *See id.*

Records obtained from Wyatt indicate that Attorney Hillis visited Mr. Soto at Wyatt only two times during his entire representation of Mr. Soto, and only once prior to trial. He met with him at Wyatt on Sunday, August 23, 2009 from 11:41 AM until 11:42 AM. *See* ECF No. 1812-1. This was the only time that Attorney Hillis met with Mr. Soto prior to jury selection on September 1, 2009, nine days later. *See* ECF No. 856. Presumably, Attorney Hillis used his one minute with Mr. Soto to show him the plea agreement. This single minute did not provide Attorney Hillis with enough time to review any discovery with Mr. Soto. As this was Mr. Soto's only meeting with Attorney Hillis prior to trial (*see* ECF No. 1812-1), and Wyatt records do not show any meetings between Mr. Soto and Attorney Knapsack (*see* ECF No. 1812-2), it appears that there was not an adequate amount of

16

time for counsel and client to discuss discovery, let alone review it together, prior to jury selection.[12] It is not clear whether the discovery was made available to Mr. Soto at the Wyatt library or not, but even if it was, the records demonstrate that Mr. Soto did not have the opportunity to review the discovery with any attorney.

Nine days after Attorney Hillis's one-minute meeting with Mr. Soto on September 1, 2009, the Court picked a jury. *See* ECF No. 856. On the same day, the government made good on its threat and filed a second-offender notice pursuant to 21 U.S.C. § 851 as to Mr. Soto. *See* ECF No. 847.[13] Trial began on September 22, 2009. *See* ECF No. 913. The following day, during Mr. Soto's trial, Attorney Knapsack filed a motion to substitute attorney, in which she explained that she had "been on a leave of absence since July of 2009" and that Attorney Hillis had "been directly involved in the defense of Mr. Soto since that time." ECF No. 915.

Mr. Soto likely had no opportunity to review his discovery before trial, including before or when he met with Attorney Hillis, who had only recently become his attorney pursuant to a last-minute "changing of the guard," for one minute on Sunday morning. At that meeting, Attorney Hillis presumably showed Mr. Soto a plea offer (that had already expired, but in light of an extension provided by the government, was due to expire at noon the following day). At the time that Mr. Soto evaluated the government's plea offer, he did not have the benefit of having had reviewed or discussed

---

[12] The only other attorney visit reflected in the Wyatt records is a 93-minute meeting between Attorney Hillis and Mr. Soto on February 8, 2010, well after trial, in anticipation of sentencing, and presumably to review the first disclosure of the Presentence Report. *See* ECF Nos. 1812-1 & 1812-2 (Wyatt Visitation Records).

[13] The Court ultimately treated the § 851 notice as withdrawn for lack of proof. *See* ECF No. 1511 at 69–70 ("THE COURT: I treated it as withdrawn because the government didn't come forward with proof. I didn't sentence. MR. CHEN: That's correct. The government is withdrawing the motion. We cannot prove that.").

discovery in his case with his attorney, and his decision to reject the plea offer and proceed to trial was both rushed and uninformed.

Mr. Soto did not get credit for acceptance of responsibility because he went to trial. A three-point reduction would have been significant for Mr. Soto, who was facing a high Guidelines range. In addition, going to trial had the effect of increasing the quantity calculation to which he was exposed. Had he accepted the government's plea offer and received acceptance of responsibility, he would have faced a Guidelines imprisonment range of 151–188 months pursuant to the plea agreement. Even if the Court calculated a higher range, Mr. Soto would have had the likely benefit of a *Fernandez* departure.

In addition, it is unclear to what extent Mr. Soto's decision to proceed to trial had on the Court's view of his acceptance of responsibility at sentencing and of his expression of remorse and what those attributes say about a person's willingness to change. What is clear to undersigned counsel is that Mr. Soto now takes, and has always taken, full responsibility for his offense conduct; regrets the decision to go to trial; and proceeded to trial, not out of a willful thumbing of his nose at accepting responsibility, but rather, because he did not have any opportunity to review discovery, and was uninformed as to the evidence against him regarding drug quantity. He has taken steps while incarcerated to try to rehabilitate himself and in recognition that he committed a serious offense.

C.    The Court should consider Mr. Soto's youth at the time of the offense.

The Court should consider Mr. Soto's youth at the time of his offense, combined with Supreme Court precedent and scientific evidence suggesting that brain development progresses well into one's twenties. Mr. Soto's offense conduct occurred when he was between the ages of 23 and 26. Undersigned counsel acknowledges that this is slightly older than the ages typically discussed in

regard to brain development. In this case, however, the argument is not made as a defense to the crime or to the formation of intent, but rather to contextualize the surrounding circumstances of the offense conduct and the defendant's history and characteristics.

It is now well-established that teenagers' brains are different from adult brains, and that their decision-making processes are less developed. Consequently, even when they are guilty of criminal offenses, they are less culpable than their adult counterparts. *See Gall v. United States*, 552 U.S. 38, 58 (2007) ("Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that *human brain development may not become complete until the age of twenty-five*. . . . While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant." (Citing sentencing transcript) (emphasis added)). Scientific studies have extended prior research on teenagers' brains to find that the brains of those in their early 20s are less developed than their older adult counterparts, particularly with regard to susceptibility of influence.

The Supreme Court has identified three major areas in which juvenile defendants differ from adult defendants: (1) Juveniles demonstrate "[a] lack of maturity and an underdeveloped sense of responsibility" which "often result in impetuous and ill-considered actions and decisions." (2) "[J]uveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." (3) "[T]he character of a juvenile is not as well formed as that of an adult." *Roper v. Simmons*, 543 U.S. 551, 569–70 (2005) (internal citations omitted). The amicus brief filed in *Roper* by a collection of professional medical and psychiatric groups notes that "[o]ne of the last areas of the brain to reach full maturity . . . is the part associated with regulating behavior, stifling

impulses, assessing risks, and moral reasoning." *Roper*, Brief of the American Medical Association, *et al.*, at 20.

Looking at the person he is today, it is clear that Mr. Soto's personality was not fixed at the age of 23 when he committed the offense. To the contrary, he has proven that he was capable of enormous change.

D.    Mr. Soto has rehabilitated himself within the Bureau of Prisons.

The Court should also vary downward to acknowledge Mr. Soto's efforts towards rehabilitation over the past 11 years in prison. It is well established that a district court may consider a defendant's rehabilitation in determining a sentence. *See, e.g.*, *United States v. Wong*, 40 F.3d 1347, 1382 (2d Cir. 1994). The Second Circuit has consistently recognized that "the Guidelines did not adequately consider rehabilitation efforts undertaken at various times." *United States v. Core*, 125 F.3d 74, 76 (2d. Cir. 1997). Thus, the Court of Appeals has authorized departures for post-offense drug rehabilitation, *United States v. Maier*, 975 F.2d 944 (2d Cir. 1992); post-arrest non-drug rehabilitation, *United States v. Workman*, 80 F.3d 688 (2d Cir. 1996); and rehabilitation while serving a prison sentence, *Core*, 125 F.3d 74. In reaching these decisions, the Second Circuit has observed that the "awareness of one's circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society, can remove a case from the heartland of typical cases, thus, constituting a valid basis for departure." *Id.* at 76 (citations omitted). Courts in this district have departed or varied downward on this basis.[14]

---

[14] *See, e.g.*, Judgment, *United States v. Valentin*, 3:16-cr-74 (MPS) (D. Conn. Oct. 13, 2017), ECF No. 91 (departing downward to the mandatory minimum "to reflect the defendant's extraordinary pre-sentence rehabilitation," which included "addressing addiction issues," and "behaving in a manner that made him a role model to others in the same program"); Judgment, *United States v. Balducci*, 3:12-cr-249 (AWT)

In Mr. Soto's case, his rehabilitation has been significant and impressive. The special conditions the Court imposed were for Mr. Soto to participate in drug treatment; attend classes to obtain a GED; participate in vocational training; and receive a mental health evaluation. It is unclear whether the BOP provided a mental health evaluation, but aside from that condition, Mr. Soto completed all of the judicial recommendations. Mr. Soto completed the 40-hour Non-Residential Drug Abuse Program. He earned his GED. He completed extensive vocational programming. He earned certificates in HVAC Electrical and Gas Heating, and received vocational training in Carpentry. He also participated in over twenty-five additional educational programs, including, just to name a few, Ready to Work, Employment, Understanding Recidivism, Mock Job Fair, Typing Efficiency, Real Estate 101, Math, First Aid/Safety, Public Speaking, Business Law, and Keyboarding. In over 11 years, he has received only a single disciplinary violation.[15]

The common thread is that Mr. Soto has demonstrated rehabilitation and accountability in the institution, and serves as an example for other inmates. In short, he has done everything possible to prepare for future success and is ready for release.

---

(D. Conn. Apr. 8, 2013), ECF No. 35 (imposing a downward departure for "extraordinary efforts at rehabilitation" and citing *Maier* decision). *See also* Judgment, *United States v. Staggers*, 3:18-cr-183 (JCH) (D. Conn. Mar. 24, 2019), ECF No. 99 (imposing non-Guidelines sentence with variance based on "the defendant's post-arrest conduct and his extraordinarily rehabilitation").

[15] Mr. Soto received a disciplinary ticket on June 25, 2018 for possessing USB charging cords, a USB wall adapter, and a portable charger. Mr. Soto has already been sufficiently punished for this infraction, having received sanctions including 30 days in disciplinary segregation, loss of 41 days' good conduct time, and the loss of visiting, phone, email and commissary privileges for an entire year. *See* ECF No. 1811-6.

E.    The Court should consider the concept of incremental punishment.

A 19-year sentence for this offense is unnecessarily excessive because this was Mr. Soto's

first lengthy period of incarceration. In *United States v. Mishoe*, the Second Circuit stated:

> Obviously, a major reason for imposing an especially long sentence upon those
> who have committed prior offenses is to achieve a deterrent effect that the prior
> punishments failed to achieve. That reason requires an appropriate relationship
> between the sentence for the current offense and the sentences . . . for the prior
> offenses.

241 F.3d 214, 220 (2d Cir. 2001). *Mishoe* specifically addressed the Career Offender Guidelines, but

its concept of incremental punishment applies here. Prior to this case Mr. Soto had been incarcerated

for a total of less than 30 months, and the longest sentence he had ever served was 15 months.

Mr. Soto's current sentence is more than 15 times as long as the longest prior sentence he had ever

served. Mr. Soto has now served a sentence that is over 8 times as long as any prior sentence he

served. Such a sentence is sufficient to deter future criminal conduct.

F.    Mr. Soto is unlikely to recidivate, in light of his current age and relatively minor
criminal history.

Not only should the Court acknowledge Mr. Soto's age at the time of his crime, but the Court

should also consider his current age. At 37 years old, Mr. Soto is statistically unlikely to recidivate.

*See, e.g.*, *United States v. Tucker*, No. 3-cr-246-02, 2019 WL 324423, at *2 (S.D. Iowa Jan. 23, 2019)

(granting relief under the First Step Act and noting that "defendant turned fifty last year, an age at

which the Sentencing Commission has found that recidivism rate begins to decline substantially" and

rejecting the government's concerns because a sentence reduction is "in the interests of justice and

furthers the purposes set forth in 18 U.S.C. § 3553(a)" (citation omitted)). Many courts have relied

upon recidivism statistics from the United States Sentencing Commission in deciding to impose a

below-or non-Guidelines sentence. Relying on statistical analyses in numerous categories over a

fifteen-year period, the Sentencing Commission has found that recidivism rates are strongly correlated with various factors, including age. U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004). The Sentencing Commission's report found that "[r]ecidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates." *Id.* at 12. Offenders 36 to 40 years of age have a recidivism rate of 19.7 percent, while offenders under age 21 have a recidivism rate of 35.5 percent. *Id.* at 28.

Prior criminal history is also a strong predictor of recidivism. Mr. Soto's relatively minor criminal history, coupled with his age, makes him unlikely to reoffend. The Court considered the "relatively . . . minor offenses" that comprised Mr. Soto's criminal history at the time of sentencing. *See* ECF No. 1511 at 65. Still, the Court sentenced Mr. Soto to a sentence that was 15 times as long as the longest prior sentence he had ever served. We now have the benefit of an additional nine years of sentencing in the non-mandatory Guidelines context, and our perspective has radically changed on the efficacy of long sentences for drug offenders.

G.    A time-served sentence is appropriate given the paradigm shift in drug sentencing.

There has been a paradigm shift since Joel Soto was arrested in February 2009 and since the Court sentenced him in June 2010. With increasing fervor, lawyers, scholars, and community members have criticized the so-called "War on Drugs" and the effectiveness of mass incarceration. According to one article, "The 'get-tough' era of punishment led to exponential growth in the rate of incarceration in the United States. Recent reviews of the literature indicate, however, that limited rigorous research exists examining the effect of imprisonment on the likelihood of future

offending."[16] The "get-tough era of punishment" had little positive effect on crime rates, and some studies have shown that increased punishment has had a negative effect on crime rates. "Incarceration has been declining in effectiveness as a crime control tactic since before 1980. Since 2000, the effect of increasing incarceration on the crime rate has been essentially zero. . . . In fact, large states such as California, Michigan, New Jersey, New York, and Texas have all reduced their prison populations while crime has continued to fall."[17] "[I]t is no longer reasonable to even hypothesize that crime patterns can be explained in terms of punishment policies or imprisonment rates."[18] Significantly, states that reduced their imprisonment rate between 2010 and 2015 saw a greater average decline in their crime rates (14 percent) than states that increased imprisonment during those years (8 percent average crime rate).[19]

Public opinion supports the view that mass incarceration is unnecessary and ineffective. "The Guidelines and congressionally directed ranges are significantly harsher than community sentiment recommends."[20] There is a growing consensus that rehabilitation should principally replace incarceration as a tool for addressing crime. "A majority of the American public favors alternatives to incarceration. Eighty-seven percent of respondents in one national survey indicated they would be more likely to support alternatives to incarceration for non-violent justice-involved individuals

---

[16] Ojmarrh Mitchell, *Examining Prison Effects on Recidivism: A Regression Discontinuity Approach*, 34 JUSTICE QUARTERLY 571 (Aug. 2016).

[17] Brennan Center for Justice, *What Caused the Crime Decline?* at 15 (Feb. 2015), https://www.brennancenter.org/publication/what-caused-the-crime-decline.

[18] Michael Tonry, *Why Crime Rates Are Falling throughout the Western World*, MINN. LEGAL STUDIES RES. PAPER No. 14-41 (Oct. 2014), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2520500.

[19] Pew Charitable Trusts, *State Reforms Reverse Decades of Incarceration Growth* 9 (2017), http://www.pewtrusts.org/~/media/assets/2017/03/state_reforms_reverse_decades_of_incarceration_growth.pdf.

[20] Hon. James S. Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?*, 4 HARV. L. & POL'Y REV. 173, 195 (2010).

(40% when it comes to a violent crime) if research consistently showed there are ways other than incarceration to reduce the likelihood that they will commit new crimes (National Institute of Corrections [NIC], n.d.). A review of more than 50 public opinion research studies conducted since 2000 demonstrates growing and broad support for alternatives to incarceration, rehabilitation, and treatment (Opportunity Agenda, 2014). Eighty-four percent of respondents from one study support alternatives to prison (such as drug treatment, community service, or probation) for nonviolent offenses (Lake, Gotoff, & Pultorak, 2013)."[21] Another article concluded that "[s]erious doubts about our system of mass incarceration emerge in a nationally representative survey, even in more politically conservative, rural parts of the country. Indeed, in an era of broad speculation about a growing urban-rural divide, there is general consensus between rural America, small cities and major metropolitan areas that our system of criminal justice is not working and communities should focus on priorities other than spending millions on prisons and jails."[22]

The Department of Justice itself has responded in various ways to this paradigm shift. In August 2013, then-Attorney General Eric Holder issued a memorandum directing federal prosecutors not to seek mandatory minimum sentences in many drug cases and to seek more lenient sentences generally in drug cases. In the District of Connecticut, local practice responded in kind with respect to practices concerning mandatory minimums, conspiracy, and large-scale round-ups.

The enactment of Guidelines amendments to lower drug sentencing ranges was one product of this paradigm shift. Another was the reason Mr. Soto is to be resentenced today: the passage of the

---

[21] National Institute of Corrections, *Myths and Facts: Why Incarceration is Not the Best Way to Keep Communities Safe* 8 (2016), https://s3.amazonaws.com/static.nicic.gov/Library/032698.pdf.
[22] Greenberg Quinlan Rosner Research, *The Evolving Landscape of Crime and Incarceration* (Apr. 2018), https://storage.googleapis.com/vera-web-assets/inline-downloads/iob-poll-results-summary.pdf.

Fair Sentencing Act and, now, the First Step Act by Congress. Members of Congress, after years of passing ever more punitive laws related to drugs, finally realized they had over-reached, and have given the Court an extremely rare chance to revise sentences once thought to be immutable. What constitutes a "sufficient" sentence, "without being greater than necessary" is a question necessarily colored by this shift in paradigm.

H.    A comprehensive reentry plan is available.

One of the factors the Court must consider is the "kinds of sentences available." 18 U.S.C. § 3553(a)(3). In this case, we have created a comprehensive reentry plan to facilitate Mr. Soto's return to the community. As detailed in the attached Exhibit A, Mr. Soto plans to live in Bridgeport with his brother, Roberto Soto, Jr., and his brother's wife and stepson. Mr. Soto's brother and his family are prepared to welcome Mr. Soto into their home and to provide him with support as he reintegrates into society. Mr. Soto will have stable housing, pro-social support, and medical/mental health treatment upon release, as well as support from family and friends in seeking employment, all of which will decrease the possibility of recidivism and further his efforts at rehabilitation. In this way, the implementation of the reentry plan will, at this stage, be more effective than further incarceration at furthering the goals of sentencing.

I.    A sentence of time served would allow Mr. Soto to spend time with his mother at the end of her life.

Mr. Soto's mother lives in Puerto Rico and is being treated for Stage IV stomach cancer. *See* ECF No. 1814 (medical records). He is very close to his mother and hopes for the opportunity to visit her in person before she dies, if he is released from prison and subsequently granted permission to travel. *See* ECF No. 1816-1. Mr. Soto asks the Court to consider his mother's likely terminal diagnosis in deciding whether to resentence him to time served. *See, e.g.*, *United States v. Jones*,

No. 3:99-CR-264 (VAB), 2019 WL 4933578, *17 n.3 (D. Conn. Oct. 7, 2019) (Bolden, J.) (in resentencing defendant to time served under the First Step Act, noting that defendant's "desire to care for his ailing wife, who has Stage IV cancer, and family, is additional evidence of post-sentencing rehabilitation.").

J.    The purposes of sentencing support a sentence of time served.

A sentence of time served (approximately 150 months with good time credit) and imposition of a period of supervised release with the attached reentry plan will be "sufficient, but not greater than necessary," to serve the § 3553(a) purposes of providing just punishment for Mr. Soto's offense, providing adequate specific and general deterrence, protecting the public, and facilitating Mr. Soto's rehabilitation.

### 1.    A sentence of time served will provide just punishment for Mr. Soto's offenses.

Section 3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The punitive effect of any sentence is not viewed in a vacuum by reference to an offense alone; rather, that effect is, and must be, measured against Mr. Soto. Prior to this offense, Mr. Soto had served no more than 30 months in prison and his longest period of confinement was 15 months. He has now served nearly 11 years in prison (approximately 12 and a half years with good time). Such a period of time is objectively punitive, and is also subjectively punitive insofar as it exceeds, by a multiple of 8, any prior period of time Mr. Soto has served.

Mr. Soto was punished in other ways as well. In his letter, he describes how he and his family have suffered as a result of his incarceration (ECF No. 1816-1). He has demonstrated insight into how his actions directly impacted his son and parents, whom he left behind:

> I have a son who was 6 years old when I came to prison. My son will be 17 years old and I missed out on his childhood years and couldn't be there for him due to my choices, my actions, and my criminal behavior. But today, I consider myself a changed man from who I used to be and plan to be a better father to my son and a better son to my own parents.

*Id.*

This was a serious offense involving distribution of a large quantity of drugs that caused harm to the community. That fact is not in dispute. At the same time, however, although Mr. Soto's role was very serious, it is also clear from the record that he entered the conspiracy when it was already well underway and that at 23 years old, Mr. Soto was susceptible to influence. Moreover, unlike many other defendants who come before the Court, Mr. Soto has no history of violence, whatsoever, and had no history of using or carrying firearms.

By any measure, a period equivalent to 12 and a half years in prison for a non-violent offender with a limited criminal history is an extremely serious punishment that sufficiently fits the severity of Mr. Soto's crime.

> **2.     A sentence of time served, along with imposition of a period of supervised release and implementation of a reentry plan, will provide adequate specific and general deterrence, and will protect the public.**

There is no need for the Court to impose a longer sentence in order to deter Mr. Soto from committing future crimes. Mr. Soto has already served a sentence that is a multiple over 8 times longer than the prior sentence he served. It has had a sufficiently deterrent effect, a fact that is evident, not only in Mr. Soto's letter to the Court (ECF No. 1816-1), but also in his demonstrated behavior over the last decade.

"[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."[23] There is certainly no empirical evidence to suggest a period of imprisonment longer than the equivalent of 12 and a half years is a necessary deterrent. Indeed, "[t]o our knowledge, there is no rigorous empirical study of whether, among second-time felons, tougher types of sanctions than what the individuals previously received results in the specific deterrent effect anticipated under contemporary sentencing schemes. Put differently, little evidence exists that a 'recidivist sentencing premium' (Roberts 2008:468) reduces recidivism."[24] "[P]robation and intensive probation are more effective than jail or prison, respectively, in reducing offending among first-time felons."[25]

At 37 years old, and with his limited criminal history prior to this offense, Mr. Soto is in a demographic that has a generally low risk of recidivism. Rather, the factors that led to Mr. Soto's risk of offending in the first place, including his history of trauma, mental health and substance abuse issues, and desperate economic circumstances, have been addressed. Mr. Soto has undertaken the hard work of rehabilitating himself and opening himself up to treatment for the first time ever while incarcerated. He has taken substance abuse and mental health classes; has undertaken job training programs; has accumulated valuable employment experience while incarcerated; and has bettered himself through countless educational programs. He has his GED and has built a track record of fiscal

---

[23] Ellen Raaijmakers et al., *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. RES. CRIME & DELINQUENCY 1, 4 (2017).
[24] Daniel Mears & Joshua Cochran, *Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions*, 54 J.RES. CRIME & DELINQUENCY 24 (2017).
[25] *Id.* at 24.

responsibility while incarcerated. There is a plan in place to address housing, employment, and mental health/medical needs. Implementing this plan will best address the possibility of recidivism.

The best way to protect society is to address the root causes of Mr. Soto's criminal behavior, including substance abuse issues which began when he was 12 years old. Courts have recognized that, where a defendant's crime was motivated by an underlying addiction, the most appropriate and effective method of deterring future crime is to treat the addiction. In *United States v. Hicks*, the Court reasoned, "treating the addiction is a more effective way to halt the criminal activity than harshly punishing the crime without regard to its broader context." 985 F. Supp. 2d 1307, 1310 (M.D. Ala. 2013).

A longer period of imprisonment is not only unnecessary to achieve the goals of punishment and protecting society, but could actually be counterproductive insofar as long periods of incarceration have been shown to increase the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties.[26]

As for general deterrence, there is no evidence that the severity of a sentence (as opposed to the certainty of the conviction) has any general deterrent value. "[T]here is little evidence that increases in the length of already long prison sentence yield general deterrent effects that are sufficiently large to justify their social and economic costs."[27] "Empirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit

---

[26] Francis T. Cullen et. al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 PRISON J. SUPPLEMENT 485 (2011); U.S. Sent'ng Comm'n, Staff Discussion Paper, Sentencing Options under the Guidelines at 18–19 (Nov. 1996), *available at*
http://www.rashkind.com/alternatives/dir00/USSCsentencingoptions.pdf.
[27] Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUSTICE 199, 201 (2013).

crimes. The National Academy of Sciences (NAS) concluded that 'insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects.'[28] Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.[29] The report, commissioned by the British Home Office, examined penalties in the United States, as well as several European countries. It examined the effects of changes to both the certainty and the severity of punishment. While significant correlations were found between the certainty of punishment and crime rates, the correlations between sentence severity and crime rates were not sufficient to achieve statistical significance.[30] The report concludes that the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.[31]

### 3. A sentence of time served, along with a period of supervised release and reentry plan, will provide for Mr. Soto's rehabilitation.

The last statutory factor, the goal of rehabilitation, has already been met to a significant extent and will be best met going forward by transitioning Mr. Soto back into society. 18 U.S.C. § 3553(a)(2)(D) requires the Court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Mr. Soto has already taken advantage of the resources that are available to him within BOP. When released, he will be subject to a term of supervised release of

---

[28] Brennan Center, *supra*, at 26.
[29] *See* ANDREW VON HIRSCH, *et al.*, CRIMINAL DETERRENCE AND SENTENCE SEVERITY: AN ANALYSIS OF RECENT RESEARCH (1999).
[30] *Id.*
[31] *Id.*

31

at least five years, during which time he will be supervised by the U.S. Probation Office, who will be able to connect him with resources as needed.

## IV. The term of supervised release should be reduced from 8 to 5 years.

Mr. Soto was originally sentenced to 8 years of supervised release on each count. At the time, the statutory minimum term of supervised release for each count was 5 years under 21 U.S.C. § 841(b)(1)(A). However, the U.S. Probation Office erroneously reported that the applicable mandatory minimum term of supervised release was 8 years (PSR ¶ 62), and it appears that this error drove the Court's sentence.[32] The First Step Act provides the Court with an opportunity to correct this mistake. The term of supervised release should be lowered to 5 years on the powder cocaine count under § 841(b)(1)(A), and to 4 years on the crack cocaine count under § 841(b)(1)(B).

## CONCLUSION

Joel Soto has been incarcerated since February 4, 2009, or 129 months (nearly 11 years), for his non-violent participation in a drug conspiracy when he was between the ages of 23 and 26. With good time credit, he has served the equivalent of a sentence of 150 months (approximately 12 and a half years). Absent relief, Mr. Soto will not be released from prison until September 2025, at which time he will be 43 years old.

The Court has a rare opportunity in this case: the opportunity to take a "second look"[33] at a sentence that to the Court "seem[ed] like a waste" at the time (*see* ECF No. 1511 at 63); a sentence

---

[32] The error in the PSR may have been driven by the thought that the § 851 notice would apply; however, it ultimately did not apply.

[33] *See* Hon. Paul G. Gardephe, *Federal Sentencing: Time For A Second Look?,* 43 AM. BAR ASS'N LITIG. J. 6 (June 1, 2017); Hon. Stefan R. Underhill, *Did the Man I Sentenced to 18 Years Deserve It?*, N.Y. TIMES, Jan. 23, 2016, at SR4, *available at* https://www.nytimes.com/2016/01/24/opinion/sunday/did-i-sentence-a-murderer-or-a-cooperative-witness.html.

that, in the light of all of the factors listed above, may be longer than necessary to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully, Joel Soto reiterates his request that the Court exercise its discretion to impose a sentence of time served and reduce his term of supervised release to 5 years.

Respectfully submitted,

THE DEFENDANT,
Joel Soto

OFFICE OF THE FEDERAL DEFENDER

Dated: October 17, 2019

_/s/ Carly Levenson_
Carly Levenson
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: 203-498-4200
Fax: 203-498-4207
Bar No. phv09665
Email: Carly_Levenson@fd.org

_Assisting on the Brief_:

Andrew P. Giering
Research and Writing Attorney
10 Columbus Boulevard, Floor 6
Hartford, CT 06106
Phone: 860-493-6260
Fax: 860-493-6269
Bar No. ct29332
Email: Andrew_Giering@fd.org

33

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 17, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Carly Levenson*
Carly Levenson